UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

COURTHOUSE NEWS SERVICE,

Plaintiff,

v.

NANCY COZINE, in her official capacity as Oregon State Court Administrator

Defendant.

Case No. 3:21-cv-00680-YY

FINDINGS AND RECOMMENDATIONS

YOU, Magistrate Judge.

**FINDINGS**

Plaintiff Courthouse News Service brings this 42 U.S.C. § 1983 action against defendant Nancy Cozine, the Oregon State Court Administrator, asserting that Oregon state court policies regarding public access to newly filed civil complaints violate the First and Fourteenth Amendments. Compl., ECF 1. Currently pending is plaintiff's motion for summary judgment. ECF 38. The motion should be denied because plaintiff has failed to show that defendant's policy of performing a human review of all newly filed civil complaints before releasing them to the public violates plaintiff's qualified First Amendment right to access those complaints.

//

//

## I. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party does so, the nonmoving party must go beyond the pleadings and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citing Fed. R. Civ. P. 56(e)).

The court "does not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999). "Reasonable doubts as to the existence of material factual issue are resolved against the moving parties and inferences are drawn in the light most favorable to the non-moving party." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## II. Discussion

A detailed discussion of this case's factual background can be found in the court's previous Findings and Recommendations on defendant's motion for summary judgment. *See Courthouse News Serv. v. Cozine*, No. 3:21-CV-00680-YY, 2022 WL 593603, at *1 (D. Or. Feb. 14, 2022), *report and recommendation adopted,* 2022 WL 1000775 (D. Or. Apr. 4, 2022). The parties agree that the Ninth Circuit's decision in *Courthouse News Service v. Planet* ("*Planet III*") provides the applicable standard for evaluating whether a court's administrative procedures violate the media's "right of timely access to newly filed nonconfidential complaints." 947 F.3d

581, 585 (2020). *Planet III* established a two-pronged test for this analysis. First, a reviewing court must determine whether "the qualified First Amendment right of access" exists as to the judicial record in question. In making this determination, the court considers "(1) whether that proceeding or record 'ha[s] historically been open to the press and general public' and (2) 'whether public access plays a significant positive role in the functioning of the particular [governmental] process in question.' " *Id.* at 590 (quoting *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8 (1986) ("*Press Enterprise II*")). If both elements are met, a qualified First Amendment right of access attaches to the implicated judicial records, and the reviewing court then considers whether a restriction on that right "is essential to preserve higher values and is narrowly tailored to serve those interests." *Id.* at 595 (quoting *Press-Enterprise II*, 478 U.S. at 13–14).

Previously, the court denied defendant's motion for summary judgment on the first prong and ruled that plaintiff's First Amendment "right to timely access attaches at the moment of filing, i.e. when the complaint is received by the court," and not, as defendant asserted, after the received complaint was reviewed by court "for proper form and legibility and checked to ensure the payment or waiver of court fees" and then "accepted." *Cozine*, 2022 WL 593603 at *1, *5; *see also* Resp. 18, ECF 57. The task now is to determine whether the delays in access to newly filed civil complaints that result from defendant's current practice of manually reviewing filed complaints before making them available to the media violates plaintiff's qualified First Amendment rights as a matter of law. *See Planet III*, 947 F.3d at 594–95.

Because defendant's media access policies here resemble content-neutral time, place, and manner restrictions, they are not subject to strict scrutiny: "An incidental delay of the right of access to newly filed civil complaints does 'not pose such inherent dangers to free expression, or

present such potential for censorship or manipulations, as to justify application of the most exacting level of First Amendment scrutiny.' " *Id.* at 595 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 661 (1994)). "Some reasonable restrictions resembling time, place, and manner regulations that result in incidental delays in access are constitutionally permitted where they are content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice." *Id.* at 585. In other words, the First Amendment does not "deman[d] immediate, pre-processing access to newly filed complaints." *Planet III*, 947 F.3d at 594. Instead, restrictions on the media's access to newly filed complaints is analyzed using a "rigorous" balancing test that asks first whether there is a "substantial probability" that an important government interest "would be impaired by immediate access, and second whether there is any reasonably available alternative that could adequately protect that government interest." *Id.* at 596 (citing *Press-Enterprise II*, 478 U.S. at 14).

Defendant asserts an interest in "the fair and orderly administration of justice," which includes the "protection of litigant and third-party privacy interests, maintaining and promoting administrative efficiency, ensuring compliance with court rules, and protecting the integrity of court records." Resp. 20–21, ECF 57. More specifically, defendant posits that the human review of newly filed complaints before releasing them to the public and media allows court staff to ensure that filers are following court rules, correct errors, and protect information that should be confidential from being publicly disclosed. Resp. 22, ECF 57. Human review also allows court clerks to resolve outstanding questions about the filing, ensure that filing fees were paid, and protect the integrity of court records. *Id.* These types of interests are sufficiently important to justify certain limitations on public or media access to judicial proceedings or documents in the right circumstance. *See Planet III*, 947 F.3d at 596 ("The First Amendment does not require

courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press."); *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978) ("It is uncontested . . . that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files[.]").

The key evidence upon which the parties rely is a spreadsheet containing data about all the civil complaints that were filed in Oregon state courts from January 1, 2019, to April 30, 2022.[1] Additionally, defendant provided data from the six-week window from July 14, 2022, to August 31, 2022, immediately prior to the filing of plaintiff's motion for summary judgment.[2] The data sets themselves are uncontroverted, though the parties disagree about how to measure the data and how the data should be interpreted in evaluating plaintiff's constitutional claims.

From January 1, 2019, to April 30, 2022, Oregon litigants submitted 144,244 complaints to e-filing systems for courts across the state.[3] Of those submissions, 133,682 were "accepted" and 10,562 were "rejected."[4] The Oregon Judicial Department has promulgated "Policy and Standards for Acceptance of Electronic Filings in the Oregon Circuit Courts," and these Standards provide twenty-seven specific reasons that a circuit court will reject a filing.[5] Some of these reasons include selecting the wrong case type, misidentifying the parties, filing a document with the incorrect filing fee, improperly filing a confidential document as part of a larger document set, and more.[6] The Standards require Oregon court clerks to review e-filed documents

---

[1] Because the data set is large, the parties submitted the exhibits containing the data on physical flash drives, which are on file with this court. *See* Lansverk Decl. ¶¶ 3, 6, ECF 43; Dupree Decl. Exs. 4, 4.1, 5, 6, ECF 59-4–59-7.
[2] Dupree Decl. Ex. 5, ECF 59-6; *id.*, Ex. 7 at 1, ECF 59-8;
[3] Shimabukuro Decl. Ex. 1, ECF 42-1.
[4] *Id.*
[5] Fetterly Decl. Ex. 16 at 5–9, ECF 45-16.
[6] *Id.*

before "accepting" them to ensure the documents comply with the Standards.[7] And defendant produced evidence that filers' submissions were routinely rejected for a variety of reasons, most commonly for entering party names incorrectly or failing to pay the correct filing fee.[8]

But filers make other, more potentially impactful mistakes as well. The Oregon Uniform Trial Court Rules ("UTCR") put the onus on filers to "designate the correct case type, case code, and document security designation." Resp. 6, ECF 57; UTCR 21.070(6); UTCR 21.040(2)(b).[9] Despite this requirement, defendant asserts that "confidential information is routinely submitted for filing without being designated as such, and court clerks are empowered to—and do—correct the designations in order to accept those documents for filing." Resp. 23, ECF 57.[10] Declarations from several trial court administrators from across Oregon each explain that "filers regularly make mistakes and fail to designate confidential information," and that the administrators "receive consistent reports from [the] supervisor team about e-filing issues that arise."[11] The administrators explain that "[s]ome mistakes such as improperly including confidential information in an otherwise public PDF, are unable to be corrected and must be rejected, but mistakes such as not designating a document as confidential can be corrected by staff, and staff regularly makes such corrections."[12]

Plaintiff points out that the reported instances where the human review process identified errors in confidential filings are very rare; out of over 144,000 civil complaints submitted

---

[7] Cozine Decl. ¶ 12, ECF 58.
[8] Keating Decl. ¶¶ 13–15, ECF 44.
[9] *See also* Fetterly Decl. Ex. 11 at 12, ECF 45-11 (terms of use for Oregon's e-filing system).
[10] *See also* Cozine Decl. ¶¶ 9–15, ECF 58; Rambo Decl. ¶¶ 8–12, ECF 62; Marcille Decl. ¶¶ 8–12, ECF 63; Bonkosky Decl. ¶¶ 9–13, ECF 64.
[11] *E.g.* Rambo Decl. ¶ 8, ECF 62.
[12] *Id.* ¶ 12.

between January 2019 and April 2022, plaintiff identified only 26 complaints, or 0.18 percent, that were rejected for a reason related to confidentiality:

- 9 complaints were rejected for combining confidential and nonconfidential documents into a single document for filing.[13]
- 8 complaints were rejected because they were improperly filed as a nonconfidential civil case and should have been filed as a family or domestic case, including at least two petitions for a stalking protective order.[14]
- 9 complaints were rejected for containing protected personal information.[15]

Defendant responds that the e-filing system can track statistics for rejected filings, but "does not track the occasions on which clerks themselves correct a situation where a filing was filed in the wrong case, with the wrong document security, or using the wrong filing code (which would render otherwise confidential information public upon filing)[.]"[16] And defendant also produced evidence showing that human review led to the suspension of one filer who was attempting to use the court's e-filing system to make violent threats against an individual, including publishing a personal address, as well as another instance where a filer attempted to file a civil case that should have been filed as confidential juvenile case.[17]

These instances may not be large in number during the relevant time, but there is no dispute that defendant's human review process prevented the leak of confidential information and that the disclosure of such information can have harmful and sometimes irreversible consequences. That distinguishes this case from *Planet III*, where the defendant court clerk "stipulated that the complaints did not contain private or confidential information," and thus the court's "no-access-before-process" policy bore "no real relationship to the County's legitimate

---

[13] Keating Decl. Ex. 4, ECF 44-4.
[14] Keating Decl. ¶¶ 23, 27, 34–35, ECF 44.
[15] *Id.* ¶¶ 31–32.
[16] *Id.*
[17] Cozine Decl. Ex. 2 at 1–3, ECF 58-2; Dupree Decl. ¶¶ 29–33, ECF 59.

administrative concerns about privacy and confidentiality[.]" 947 F.3d at 597. Here, by contrast, the human review process is directly related to and helps promote defendant's interest in protecting the rights of litigants and third parties. *See id.* at 596 (collecting cases and recognizing the protection of privacy of litigants and third parties as an important government interest). The inadvertent disclosure of sensitive information to the media, such as the name of a minor child who was subjected to abuse, or the address of a domestic violence victim, could have devastating and long-lasting consequences on a litigant's or third party's safety, privacy, or economic interests, as well as erode public confidence in the state's courts as custodians of that information.[18] *See Courthouse News Serv. v. Harris*, No. CV ELH-22-0548, 2022 WL 17850125, at *35 (D. Md. Dec. 22, 2022). Defendant has therefore produced evidence showing that the pre-access human review is directly related to their interest in the fair and orderly administration of justice, and that this interest would be impaired if the human review policy was not in place. *Planet III*, 947 F.3d at 599; *see also Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th 1245, 1270 (10th Cir. 2022) (reversing district court's entry of preliminary injunction in the plaintiff's favor because the court failed to adequately accommodate the defendant's "interest in ensuring efficient administration of the court and accuracy of court records . . . [which] would be severely impacted should a pleading be released to the press only to be withdrawn, redacted, sealed, or amended prior to acceptance").

---

[18] *See, e .g.*, Keating Decl. Ex. 7 at 5, ECF 44 (stalking protective order petition filed as nonconfidential civil case); *id.*, Ex. 5 at 5 (same). While defendants are correct that protective orders and stalking cases are not a "confidential" case type, the federal Violence Against Women Act prohibits the state from making certain documents "available publicly on the internet." Reply 16, ECF 73; 18 U.S.C. § 2265(d)(3). Defendant also has an important interest in complying with federal law, and the evidence shows that defendant's human review process advances that goal here. *See Pulaski v. Chrisman*, 352 F. Supp. 2d 1105, 1113 (C.D. Cal.), *aff'd*, 127 F. App'x 993 (9th Cir. 2005) (explaining that complying with federal law is an important state interest).

The second step of the balancing test asks whether there is any reasonably available alternative that could "adequately protect that government interest." *Id.* at 596 (citing *Press-Enterprise II*, 478 U.S. at 14). At bottom, the purpose of the Supreme Court's "rigorous scrutiny" test is to "reconcile the press and the public's interest in accessing court documents in a timely manner with the state's interest in the orderly administration of its courts." *New Mexico Admin. Off. of Cts.*, 53 F.4th at 1264. Plaintiff has failed to show that the equilibrium between these competing interests is out of balance here because the undisputed evidence in the record shows Oregon courts make nearly all newly filed civil complaints available within nine court business hours. Thus, plaintiff has failed to demonstrate it is entitled to judgment as a matter of law in its favor.[19]

The magnitude of delays in accessing newly filed civil complaints in Oregon is much smaller than in *Planet III* and other cases where plaintiff Courthouse News has asserted that court systems were preventing timely access to these court documents. For example, in *Planet III*, between twenty and sixty-five percent of newly filed civil complaints were not available to the media until at least two court days after filing, and in some cases, complaints were not accessible for up to two weeks. 947 F.3d at 597–98. In *Schaefer*, at times over 70 percent of newly filed civil cases in one Virginia court and nearly forty percent in another court were not available to the media until at least two court days after filing. *Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532, 545 (E.D. Va. 2020), *aff'd,* 2 F.4th 318 (4th Cir. 2021). In *Gabel*, almost twenty-three percent of newly filed civil cases were not available from Vermont courts

---

[19] As mentioned above, the facts underlying the parties' briefing at summary judgment and the analysis here, specifically the statistics about newly filed civil complaints in Oregon courts, are undisputed. The parties did not indicate what, if any, other triable issues remain.

until two days after filing. *Courthouse News Serv. v. Gabel*, No. 2:21-CV-000132, 2021 WL 5416650, at *7 (D. Vt. Nov. 19, 2021)

In Oregon, the delays are not as stark, though the parties vigorously disagree about how to measure the delay or how the data about the delay should be interpreted. Plaintiff asserts that the delay should be measured "in terms of the number of days that elapse between the complaint's filing and its availability to press and public." Reply 5, ECF 73. Plaintiff thus provides statistics that measure what percentage of newly filed civil complaints are made available on the same day of filing (i.e, "zero delay"), one day after filing, two days after filing, and so on.[20] Defendant criticizes this "calendar days" calculation because it fails to account for weekends, holidays, and furlough days when Oregon courts are closed to the public and not staffed with employees. Resp. 12, ECF 57. And, according to defendant, plaintiff's interpretation overcounts the actual "delay" because Oregon's e-filing system allows filers to submit complaints to Oregon at any time on any day and, for example, a complaint that is submitted to a court through e-filing on a Friday at 10 p.m. would usually not be processed and then made available to the media at least until the court re-opens to the public the following Monday. *Id.* at 13–14. According to plaintiff's "calendar day" calculation, this would be at minimum a three-day delay. Defendant asserts that the delay count should not run until the court is open to the public. *Id.* at 12–14. Building off the previous example, if the court opens on Monday morning at 8 a.m., and the Friday night complaint is processed by court staff and made available to the press by 12 p.m. on Monday, that is a four-hour delay by defendant's "business hour" calculation.

Plaintiff's "calendar days" delay calculation breaks down as follows for the relevant time period:

[20] Shimabukuro Decl. Ex. 1 at 2, ECF 42-1.

2019

- Zero Delay: 60.66%
- One Day Delay: 28.82%
- Two+ Days Delay: 12.51%

2020

- Zero Delay: 54.32%
- One Day Delay: 26.53%
- Two+ Days Delay: 19.15%

2021

- Zero Delay: 65.71%
- One Day Delay: 22.74%
- Two+ Days Delay: 11.54%

Jan.–Apr. 2022

- Zero Delay: 68.94%
- One Day Delay: 35.96%
- Two+ Days Delay: 7.1%[21]

July 13–Aug. 31, 2022

- Zero Delay: 74%
- One Day Delay: 21%
- Two+ Days Delay: 5%[22]

Defendant's "business hour" delay calculation breaks down as follows for the relevant time period:

2019

- 4 Hours to Media Access: 78.57%
- 9 Hours to Media Access: 91.94%
- 18 Hours to Media Access: 97.10%
- Beyond 18 Hours: 2.9%[23]

[21] Shimbakuro Decl. Exs. 1–5, ECF 42-1–42-5.
[22] Angione Decl. ¶¶ 4–6, ECF 76.
[23] Dupree Decl. Ex. 7, ECF 59-8.

2020

- 4 Hours to Media Access: 67.89%
- 9 Hours to Media Access: 82.69%
- 18 Hours to Media Access: 92.39%
- Beyond 18 Hours: 7.61%[24]

2021

- 4 Hours to Media Access: 81.53%
- 9 Hours to Media Access: 92.40%
- 18 Hours to Media Access: 97.26%
- Beyond 18 Hours: 2.74%[25]

Jan.–Apr. 2022

- 4 Hours to Media Access: 85.37%
- 9 Hours to Media Access: 95.11%
- 18 Hours to Media Access: 99.48%
- Beyond 18 Hours: 0.52%[26]

July 13–Aug. 31, 2022

- 4 Hours to Media Access: 95.38%
- 9 Hours to Media Access: 98.89%
- Beyond 9 Hours to Media Access: 1.11%[27]

A few observations are necessary in untangling the parties' dispute over how to interpret these statistics. First, while the Oregon e-filing system allows litigants to submit documents at any time, Oregon courts are not open to the public at all hours and on all days, and court personnel are obviously not available around the clock to provide public or media access. *See Harris*, 2022 WL 17850125 at *39 (noting differences between always-available e-filing and court hours and accessibility); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581 (1980) (explaining that the First Amendment right of access to judicial proceedings is not absolute and

[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] Dupree Decl. ¶ 13, ECF 59.

"since courtrooms have limited capacity, there may be occasions when not every person who wishes to attend can be accommodated."). While providing a press queue, as plaintiff has advocated, would allow media access to newly filed civil complaints at any time, there simply is no constitutional command that requires defendant to adopt that system. *Planet III*, 947 F.3d at 594 (noting that plaintiff's qualified First Amendment right of access does not "deman[d] immediate, pre-processing access to newly filed complaints"). Interestingly, plaintiff attempts to justify its calendar days delay calculation by pointing to Oregon's UTCR 21.080(3), which treats "a complaint as filed on the day it is submitted, even if that day is a weekend, holiday, or furlough day." Reply 6, ECF 73. That position is at odds with this court's previous rulings applying *Planet III* and plaintiff's prior insistence that the Oregon court rules "d[o] not dictate . . . the First Amendment right of access[.]" Resp. Defs. Mot. Summ. J. 5, ECF 16; *Cozine*, 2022 WL 593603 at *5 (citing *Planet III*, 947 F.3d at 588). Properly measuring the time it takes for a complaint to become available to the media should account for the reality that courts are not constitutionally required to be open to the public at all times, or to otherwise restructure their operations "to satisfy the immediate demands of the press." *Planet III*, 947 F.3d at 596; *see also Harris*, 2022 WL 17850125 at *39 (choosing business hours over calendar days in measuring delay in access to newly filed civil complaints).

Second, defendant has produced evidence tending to show that many of the most acute delays were caused or at least influenced by external events not within defendant's control, not least of which was the massive disruption to court operations during the COVID-19 pandemic, which included hiring freezes, staffing shortages, mandatory furloughs, and the implementation of new technologies and processes to keep courts functioning. Resp. 14–15, ECF 57.[28] Other

[28] *See also* Dupree Decl. Ex. 14 at 1, ECF 59-15.

spikes in delay times are correlated with the closure of the Multnomah County Courthouse, the largest in the state, for three days to facilitate the move to a new courthouse building, and an upgrade of the e-filing system and the inevitable "delays, outages, and processing issues" that followed. *Id.* at 15.[29] Severe winter weather and court closures due to wildfires also appear to have had at least some effect on the specific overall delay numbers.[30] These facts too distinguish this case from others involving plaintiff Courthouse News where the defendant state court did not produce evidence showing that the delays were "due to some unpreventable circumstance." *Courthouse News v. Schaefer*, 2 F.4th 318, 329 (4th Cir. 2021).

Thus, when looking at the statistics based on the "business hours" delay calculation, Oregon courts have provided public access to over ninety percent and up to ninety-four or ninety-five percent of newly filed complaints within 9 business hours, save for certain months where external events outside of the courts' control seemed to contribute to additional delay.[31] Moreover, the most recent statistics for the six-week period prior to the filing of plaintiff's motion for summary judgment show that Oregon courts delivered 95.36% of complaints within four business hours, and 98.89% of complaints within 9 business hours.[32] The "Constitution does not require the impossible," nor does it require "perfect or instantaneous access" to newly filed civil complaints. *Schaefer*, 2 F.4th at 318; *see also Planet III*, 947 F.3d at 594. Defendant's current system is delivering "near perfect" access to newly filed civil complaints within 9 business hours. *Planet III*, 947 F.3d at 599; *see also Courthouse News Serv. v. Forman*, No. 4:22-CV-106-MW/MAF, 2022 WL 3147675, at *6 (N.D. Fla. Aug. 5, 2022) (finding that

[29] *See also* Dupree Decl. Exs. 11–14, ECF 59-12–59-15.
[30] Dupree Decl. Ex. 14, ECF 59-15.
[31] *Id.*
[32] *Id.*, Ex. 7 at 1, ECF 59-8.

process for newly filed complaints that delivered media access within 23 hours of receipt was "a constitutionally permissible amount of time"). The First Amendment does not require this court to mandate that Oregon courts spend scarce resources to adopt plaintiff's most preferred method, or some other similar system, to instantly deliver all newly filed civil complaints to the media, especially considering the potentially serious and long-lasting harm that defendant's current system prevents.[33]

**RECOMMENDATIONS**

Plaintiff's motion for summary judgment should be denied because plaintiff has failed to show that it is entitled to judgment as a matter of law on its First Amendment claims.

**SCHEDULING ORDER**

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due Tuesday, March 28, 2023. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

---

[33] Defendant's request for judicial notice, ECF 61, should be granted to the extent it seeks to establish the existence of the proffered public records, but denied to the extent it seeks to establish the facts set forth in those records. *Vesta Corp. v. Amdocs Mgmt. Ltd.*, 129 F. Supp. 3d 1012, 1021 (D. Or. 2015) ("When a court takes judicial notice of a public record, it may do so not for the truth of the facts recited therein, but for the existence of the record, which is not subject to reasonable dispute over its authenticity.") (simplified) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001); *Klein v. Freedom Strategic Partners, LLC,* 595 F.Supp.2d 1152, 1157 (D. Nev. 2009)).

**NOTICE**

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED March 14, 2023.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge